**CITY OF BURBANK, California,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–164C.

United States Court of Federal Claims.

July 31, 2000.

---

John Peter Williams, Washington, DC, attorney of record for plaintiff. John P. Coyle, of counsel.

Richard P. Nockett, Department of Justice, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. David M. Cohen, Director, and John W. Showalter, Assistant Director.

### *OPINION*

FUTEY, Judge.

This contract case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction. The Bonneville Power Administration (BPA), an agency of the United States government (defendant), entered into a contract for the sale of electric power (Contract) with the City of Burbank, a municipal corporation, created under the laws and existing as a political subdivision of the State of California (plaintiff). Plaintiff claims that defendant breached the Contract when defendant failed to adhere to the Contract's provisions concerning (1) conversion and reversion between the two different modes of the Contract's operation, and (2) application of new rates for the sale of power to plaintiff. Plaintiff avers that it suffered heavy monetary damages from such breaches. Defendant contends that plaintiff's claims fall under the Contract Disputes Act (CDA), and that because plaintiff has neglected to meet the jurisdictional prerequisites of the CDA, the court may not hear the claims. Alternatively, defendant asserts that if the CDA does not apply to the Contract, plaintiff is barred from relief in this court because it did not bring its claims within the six-year time frame of the court's general statute of limitations. Plaintiff responds that if the CDA applies, it essentially has complied with the CDA's jurisdictional requirements, despite the fact that counsel for both the BPA and plaintiff believed at the time the dispute arose that the CDA did not apply. Plaintiff also counters that it entered a "tolling agreement" with BPA counsel which preserved its claims' timeliness until the actual filing of its claims.[1] In addition to the issues raised by the parties, the court will

---

1. The court will not reach this issue, as it is not necessary for proper disposition of the motion.

also consider *sua sponte* the possible jurisdictional conflict between the court's Tucker Act jurisdiction and the exclusive jurisdiction of the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) to review final agency decisions made by the BPA.

### *Factual Background*

Under the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 832–839h (1994 & Supp. II 1996) (referred to as the Regional Act), Congress created the BPA in order to serve the needs of the Pacific Northwest[2] for electric power. The Regional Act regulates every aspect of the sale and exchange of electric power that the BPA undertakes. The Regional Act regulates the rates at which purchasers pay for power sold by the BPA. Also, under the Regional Act the BPA may sell power to electric power utilities outside the Pacific Northwest ("extraregional sales"), but such sales are continuously subject to restrictions that ensure the delivery of adequate electric power to the Pacific Northwest in preference to any outside areas.

Plaintiff operates a municipal electric system which generates, transmits, and distributes power in California. Defendant markets, transmits, purchases, sells, and exchanges electric power at wholesale. On January 28, 1988, plaintiff and defendant entered into the Contract for the sale and/or exchange of electric power for 20 years. Plaintiff is located in Southern California, and therefore the Contract was subject to the restrictions on extraregional sales. The Contract contained provisions for two modes of operation, the power sale mode, and the exchange mode. When defendant had enough surplus power, the Contract operated in the power sale mode, which obligated defendant to transmit and sell electric power to plaintiff. When the supply of power fell for any reason, however, the surplus power available to defendant was thereby reduced, and the Contract operated in exchange mode, which obligated defendant to provide power-generating capacity to plaintiff, while obligating plaintiff to transmit power to defendant. The Contract could alternate between the two modes as comported with defendant's power requirements.

A dispute has arisen between the parties concerning defendant's frequent changes of the Contract's mode of operation. While the Contract operated in exchange mode, plaintiff was permitted to secure an alternate source of power to replace the power unavailable from defendant if the proposed exchange mode period was projected to continue for over two months. Early in 1992, while the Contract was in exchange mode, plaintiff entered into a preliminary agreement with the Montana Power Company (MPC), under which MPC would provide power to plaintiff from July 1, 1992, until June 30, 1993. Pursuant to section 6(c) of the Contract, plaintiff notified defendant of the proposed alternate power acquisition on April 13, 1992. Section 6(c) stated that defendant must respond in 21 days, informing plaintiff whether defendant approved the agreement or elected to revert to power sale mode. Defendant's acceptance of the agreement would lock the Contract into the exchange mode for the duration of the alternate power acquisition agreement; defendant's election to revert to the power sale mode instead would obligate defendant to remain in power sale mode for the time period equaling the duration of the alternate power acquisition proposed by plaintiff and MPC.

By letter dated May 20, 1992, defendant responded to plaintiff's notice, 37 days after plaintiff had sent the notice. Defendant's response stated that the Contract would revert to power sale mode at the end of the day on June 30, 1992, and would remain so until June 30, 1993. Defendant explained in the letter that it was providing notice pursuant to sections 6(d) and 6(a)(2) of the Contract, which called for advance notice to plaintiff of insufficiency of surplus power. Plaintiff accordingly canceled its agreement with MPC, and the Contract reverted to power sale

---

**2.** " 'Pacific Northwest', 'region', or 'regional' means ... the area consisting of the States of Oregon, Washington, and Idaho, the portion of the State of Montana west of the Continental Divide, and such portions of the States of Nevada, Utah, and Wyoming as are within the Columbia River drainage basin...." 16 U.S.C. § 839a(14)(A) (1994).

mode. Although section 6(c) required that the Contract remain in power sale mode until the end of the proposed alternate procurement, this requirement was limited by section 12, which allowed defendant to restrict the transmittal of power to plaintiff whenever there is an urgent need for such power within the Pacific Northwest. On August 7, 1992, defendant notified plaintiff of a lack of surplus energy that forced defendant to convert the Contract to exchange mode beginning on September 1, 1992. This conversion went into effect on that date and continued in exchange mode until September 1, 1993.

The parties' other dispute regards the application of new purchase rates for the power that defendant supplied to plaintiff. On October 1, 1996, defendant made a periodic adjustment to the rates it charged plaintiff for power pursuant to 16 U.S.C. § 839e (1994). Rates and changes to rates were promulgated by the BPA under the Regional Act in the publication entitled "1996 Wholesale Power and Transmission Rate Schedules" (Rate Book).[3] Section 9(a)(3) of the Contract provides for such adjustment and application of rates by the BPA. The section is included pursuant to § 839e of the Regional Act. Plaintiff alleges that defendant applied the new rates in a fashion not prescribed by the Contract nor the Regional Act. The BPA rate schedules included Priority Firm Power (PF) Preference Rates, and PF Exchange Rates, as well as multiple specialized services contained in the Rate Book.[4] Plaintiff avers that defendant averaged these many different rates together and applied them in a blanket fashion to plaintiff instead of calculating rates for each "specific class, type, and quality of service" rendered plaintiff, as called for in section 9 of the Contract.[5] Plaintiff also maintains that defendant applied rates that should not have been used for such a sale of electric power.[6] According to plaintiff, this misapplication of rates continued from 1996 through the filing of the claims.

Plaintiff and defendant made various attempts to resolve their disputes over the course of the Contract's operation. On March 11, 1998, plaintiff sent defendant a letter specifying in certain terms its belief that defendant caused it damages due to the two disputed actions taken by defendant. In the letter plaintiff asked that it be credited approximately $1.4 million for the two alleged breaches of the Contract. The Contracting Officer (CO) for the Contract sent a letter back in which she did not agree to defendant's liability. Plaintiff and defendant continued their correspondence, but never came to an agreement for settlement.

Plaintiff filed its Complaint on March 24, 1999, alleging a breach of the Contract by defendant due to defendant's failure to respond to plaintiff's notice of the alternative power acquisition agreement and its misapplication of the rates for the sale of power to plaintiff. Defendant filed a motion to dismiss on November 12, 1999, in lieu of an answer to plaintiff's Complaint. The court heard oral argument on defendant's motion on June 5, 2000.

### Discussion

In ruling on a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court must accept as true the complaint's undisputed factual allegations and construe the facts in the light most favorable to plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *See also Hamlet v. United States*, 873 F.2d 1414, 1415 (Fed.Cir.1989); *Farmers Grain Co. v. United States*, 29 Fed. Cl. 684, 686 (1993). A plaintiff must make only a *prima facie* showing of jurisdictional facts through the submitted material in order to avoid a defendant's motion to dismiss. *See Raymark Indus., Inc. v. United States*, 15 Cl.Ct. 334, 338 (1988) (citing *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977)). If the undisputed facts reveal any possible basis on which the nonmoving party might prevail, the court must deny the motion. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. *See also W.R. Cooper*

---

**3.** Complaint (Compl.), Appendix (App.) 2.

**4.** Compl. at 6–11, 17.

**5.** *Id.* at 17.

**6.** *Id.* at 21–22.

*Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988); *Lewis v. United States*, 32 Fed.Cl. 59, 62 (1994). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant extrinsic evidence in order to resolve the factual dispute. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991).

Defendant's motion to dismiss asserts this court's lack of subject matter jurisdiction on two separate grounds: first, that the CDA applies to plaintiff's claims, and that plaintiff has not satisfied the conditions required by the CDA in order to confer jurisdiction on this court; and second, that if the CDA does not apply, plaintiff's breach of the section 6(a) notice provision claim (Count I) is barred by the general statute of limitations prohibiting claims in this court more than six years after their accrual. The parties, however, did not originally brief the issue of the exclusive jurisdiction of the Ninth Circuit over actions taken by defendant pursuant to the Regional Act, and such jurisdiction's possible effect on this court's ability to hear plaintiff's claims. Nevertheless, as this issue is a matter of jurisdiction, the court will raise it *sua sponte*. *See* RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added)); *Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed.Cir.1988) ("A court may and should raise the question of its jurisdiction *sua sponte* at any time it appears in doubt."); *Cupey Bajo Nursing Home, Inc. v. United States*, 36 Fed.Cl. 122, 132 (1996).[7]

### I. *Pacific Northwest Electric Power Planning and Conservation Act*

■ The Regional Act provides that for challenges to final agency actions taken by the BPA, the Ninth Circuit has exclusive jurisdiction. 16 U.S.C. § 839f(e)(5) (1994). *See Pacific Power & Light Co. v. Bonneville Power Admin.*, 795 F.2d 810, 814 (9th Cir. 1986). This exclusivity was provided in or-

der to expedite challenges against the BPA's actions, and to prevent different courts from developing "potentially conflicting interpretations of the [Regional] Act." *Pacific Power & Light*, 795 F.2d at 815. A "final action" under the Regional Act exists when a decision made by the BPA is not subject to any further review by the BPA or the Federal Energy Regulatory Commission (FERC). *City of Seattle v. Johnson*, 813 F.2d 1364, 1367 (9th Cir.1987). If the action taken by the BPA is not final, any challenges must proceed through the BPA's administrative channels before it may be considered by the Ninth Circuit. *Id.* Simply because an action is not "final" for purposes of the Regional Act, a challenge to such an action still cannot be heard by a court other than the Ninth Circuit. Instead, the only path to judicial review is an administrative proceeding within the BPA or the FERC, and then an appeal of that proceeding to the Ninth Circuit. *Id.* Extraregional sales, by themselves, constitute final actions by the BPA for the purposes of the Regional Act. 16 U.S.C. § 839f(e)(1). *See Puget Sound Power & Light Co. v. United States*, 23 Cl.Ct. 46, 55, *appeal dismissed without op.*, 944 F.2d 912 (Fed.Cir.1991).

■ The Ninth Circuit has established clearly that it will be the final arbiter of which causes of action fall within its exclusive jurisdiction under the Regional Act. *Pacific Power & Light*, 795 F.2d at 815–16. A party's mere characterization of a claim as a contractual issue such as breach of contract does not obligate the Ninth Circuit to follow the party's theory of the case. *Id.* Instead, the Ninth Circuit has explained, "Congress has decided that jurisdiction under the [Regional] Act should be a function of the agency whose actions are being challenged rather than a function of the cause of action which petitioner asserts." *Id.* at 816. This court takes the same approach to jurisdiction. *Puget Sound*, 23 Cl.Ct. at 58–59. The appropriate test is therefore to determine whether a claim is challenging either BPA action "taken pursuant to statutory authority," or action

---

7. The court ordered the parties to brief this issue. The parties filed their supplemental briefs on

May 31, 2000.

that constitutes "contractual commitments" made outside the statutory requirements of the Regional Act. *Public Util. Dist. No. 1 of Clark Cty. v. Johnson*, 855 F.2d 647, 650 (9th Cir.1988). Only when claims are found to be based on actions wholly outside the statutory authority of the Regional Act will the Ninth Circuit's exclusive jurisdiction fail to encompass such claims. *Id.*

This court has recognized the importance of the ability of the Ninth Circuit to maintain its sole jurisdiction over challenges to administrative actions of the BPA. Although the Tucker Act provides a grant of general jurisdiction over government contracts, the court has held that specific statutory enactments conferring jurisdiction over certain government contracts on other courts will be allowed to carve out small parts of the Tucker Act's coverage. *Bailey v. United States*, 46 Fed.Cl. 187, 213–14 (2000) (citing *Puget Sound*, 23 Cl.Ct. at 58–60). In addition, the court has maintained that claims coming before it which involve the same facts and issues as previous challenges before the Ninth Circuit under the Regional Act will be dismissed as *res judicata*. *Commonwealth Aluminum Corp. v. United States*, 19 Cl.Ct. 300, 307–08 (1990).[8] Indeed, on its face a claim based on BPA action coming before this court is *prima facie* suspect because of the obvious desire of Congress to place these challenges in the hands of the Ninth Circuit. *Cf. Puget Sound*, 23 Cl.Ct. at 60 ("16 U.S.C. § 839f(e)(1) . . . provides a nonexclusive list of final actions subject to the Ninth Circuit's exclusive jurisdiction, including *power sales.*" (emphasis added)).

The parties assert that plaintiff's claims are based solely on contractual provisions and the specific relationship created by the Contract between plaintiff and defendant, and as such do not involve final actions by the BPA, placing the claims outside the bounds of the Regional Act. Plaintiff and defendant argue that the Regional Act does not provide the Ninth Circuit exclusive juris-

diction over plaintiff's claims, and that this court is the "appropriate court" because plaintiff claims money damages based on a contract with the government in excess of $10,000. 28 U.S.C. § 1491(a)(1) (1994); 28 U.S.C. § 1346(a)(2) (1994).

Both parties rely on the fact that plaintiff's claims reference contractual provisions to prove that jurisdiction lies in this court and not the Ninth Circuit. It is not enough to argue, however, merely that contract language touches on the issues that form the substance of the claims. The inquiry must proceed one step further: the court must determine whether the contractual provisions themselves were included pursuant to statutory authority and mandate. For the court to fail to make this further inquiry would be to disregard the guidance in interpreting claims concerning BPA power sales that has been handed down by the Ninth Circuit as well as this court. *Pacific Power & Light*, 795 F.2d at 815–16; *Commonwealth Aluminum*, 19 Cl.Ct. at 307–08.

■ Looking to the substance of plaintiff's claims, both involve defendant's administrative decisions made in the execution of a BPA final action, namely the sale of electric power outside the Pacific Northwest. 16 U.S.C. § 839c (1994). Count II of plaintiff's Complaint concerns solely the misapplication of rates to the power provided by defendant to plaintiff. Challenges to the BPA's rates, charged for electric power, have uniformly been held to fall under the Ninth Circuit's jurisdiction. *See CP Nat'l Corp. v. Jura*, 876 F.2d 745, 747 (9th Cir.1989); *Central Elec. Coop., Inc. v. Bonneville Power Admin.*, 835 F.2d 199, 204 (9th Cir.1987); *Atlantic Richfield Co. v. Bonneville Power Admin.*, 818 F.2d 701, 705 (9th Cir.1987); *City of Seattle*, 813 F.2d at 1367; *Pacific Power & Light*, 795 F.2d at 815–16. These cases, however, deal with the rate-making authority of the BPA. In the cases, rate-making was deemed BPA action precisely mandated and regulated by

---

8. This court has in fact never found jurisdiction over claims involving sales of electric power pursuant to the Regional Act. In addition, the Ninth Circuit has held only once that a claim's character was purely contractual in nature. In that case, an alleged oral contract between the parties

involved the taking of evidence and resolution of issues outside of the administrative record, and therefore the issues presented fell outside the Ninth Circuit's exclusive jurisdiction as an appeals court under the Regional Act. *Public Util. Dist. No. 1 of Clark Cty.*, 855 F.2d at 650.

the Regional Act, and therefore properly characterized as administrative, not contractual.

The parties have asserted that the holdings of these cases are inapposite to the present case. They argue that plaintiff's challenge is not to the BPA's exercise of the rate-making authority under the Regional Act, and instead is a challenge only to the BPA's application of such rates. Plaintiff and defendant therefore assert that the Ninth Circuit has no jurisdiction over the claim, as application of rates is merely part of the contractual relationship between the parties. Although it is true that previous cases holding claims to be solely within the Ninth Circuit's exclusive jurisdiction concern rate-making, see, e.g., Pacific Power & Light, 795 F.2d at 815–16, the BPA's promulgation of new rates was not intended as the only final action on which the Ninth Circuit may hear claims. See Puget Sound, 23 Cl.Ct. at 60. Nothing in the Regional Act justifies or even hints at this interpretation. Instead, as this court has explained, the Regional Act plainly states that extraregional sales by themselves are final actions subject to the exclusive jurisdiction of the Ninth Circuit Id. See 16 U.S.C. § 839(e)(1). More specifically, plaintiff's claim that the BPA misapplied rates concerns an action that is illustrated in and mandated by the Regional Act, see 16 U.S.C. § 839e, and the steps to such action are explained in and taken directly from published regulatory rate schedules in the Rate Book promulgated by the BPA. The contractual provisions concerning application of rates are based directly on the requirements of the Regional Act and the BPA's rate schedules. The alleged misapplication is therefore a final action pursuant to statutory authority, and is not purely contractual in nature. Public Util. Dist. No. 1 of Clark Cty., 855 F.2d at 650. Accordingly, the court is without jurisdiction over Count II. 16 U.S.C. § 839f(e)(5). See Pacific Power & Light, 795 F.2d at 814.

■ Next, Count I regards defendant's alleged violation of the notice requirement in section 6(c), which states that defendant had to respond to plaintiff's proposed alternative power acquisition agreement within 21 days. Plaintiff bases its breach of contract claim on this untimely reply, but its challenge does not rest with the late response to its proposed acquisition. Instead, plaintiff opposes defendant's decision to revert the Contract to the power sale mode on May 20, 1992, followed by defendant's need to convert the Contract to the exchange mode again expressed in its August 7, 1992 letter. This switching on the part of defendant, plaintiff asserts, cost plaintiff hundreds of thousands of dollars that it would have saved if it had been able to keep its alternative power acquisition with MPC.

As previously explained, the appropriate test to decide whether a claim is in essence a challenge to an administrative action under the Regional Act, and therefore within the exclusive jurisdiction of the Ninth Circuit, is whether the action was taken pursuant to statutory authority. Public Util. Dist. No. 1 of Clark Cty., 855 F.2d at 650. Plaintiff has demonstrated in its Complaint that the provisions for conversion and reversion of the Contract from power sale mode to exchange mode are included pursuant to 16 U.S.C. § 837b (1994).[9] When defendant made the decisions on May 20, 1992, and August 7, 1992, to change the mode of the Contract's operation, it did so pursuant to the Regional Act's statutory authority. The conversion to exchange and power sale modes was a core procedure in the BPA's final action of executing the extraregional sale of electricity to plaintiff. 16 U.S.C. § 839f(e)(5). See Pacific Power & Light, 795 F.2d at 814. Plaintiff's claim under Count I, therefore, is likewise a challenge of an administrative action under the Regional Act, and the court does not have jurisdiction over the claim due to the preemption by the Ninth Circuit's jurisdiction.

## II. Contract Disputes Act Applicability

Assuming arguendo that plaintiff's claims are specifically contractual in nature, the court has subject matter jurisdiction over the claim through the general grant of jurisdiction provided by the Tucker Act. The court

9. Compl. at 3.

must determine next whether the CDA applies to sales of electric power and specifically to the sale memorialized in the Contract. This determination has not been made by the court before, and as such is a matter of first impression.

The CDA streamlines the process by which an aggrieved contractor makes its claims concerning disputes arising from contracts with executive agencies.[10] It provides a specific process that must take place before the contractor files suit in this court. The CDA applies to a broad range of government contracts:

(a) Executive agency contracts

Unless otherwise specifically provided herein, this chapter applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of Title 28) entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property.

41 U.S.C. § 602(a) (1994).

Defendant asserts that the sale of its electric power is a "disposal of personal property" for the purposes of the CDA. 41 U.S.C. § 602(a)(4). Plaintiff does not challenge this assertion. "Personal property" is defined as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property...."[11] The definition of "property" owned by the government is broad. *Don't Tear It Down, Inc. v. Penn. Ave. Dev. Corp.*, 642 F.2d 527, 535 (D.C.Cir.1980). Electric power generated by the government, as an intangible thing subject to ownership, was long ago held to be "property" belonging to the United States. *Ashwander v. TVA*, 297 U.S. 288, 330, 56 S.Ct. 466, 80 L.Ed. 688 (1936). As electric power is property owned by the government, and is not an estate in real property, it is properly characterized as personal property.[12] The CDA therefore is applicable to the BPA's sale of electric power.[13]

Under the provisions of the version of the CDA applicable to the Contract, a contractor claiming damages against the government under a contract must meet certain jurisdictional prerequisites. Specifically, the contractor must submit a written claim to the CO. 41 U.S.C. § 605(a) (1988).[14] Any claim

**10.** The BPA is a component of the Department of Energy, and therefore is an "executive agency" for the purposes of the CDA. 41 U.S.C. § 601(2) (1994); 5 U.S.C. § 101 (1994) (listing Department of Energy as an executive agency).

**11.** BLACK'S LAW DICTIONARY 1233 (1999).

**12.** This court previously opened the question of whether a sale of government electric power constitutes a disposal of personal property for purposes of the CDA. *Oroville–Tonasket Irrigation Dist. v. United States*, 33 Fed.Cl. 14, 22 (1995). In that case, however, the court did not need to decide this question, and left it unanswered.

**13.** Under a Department of Energy (DOE) regulation, DOE contracts must generally include a disputes clause with language stating that aggrieved contractor claims should be presented to the agency's CO, and that appeals to the CO's decision will proceed according to the requirements of the CDA. 10 C.F.R. § 622.103(a)(1), (2) (2000). An exception is made, however, for "contracts for sale of electric power by the Power Marketing Administrations," such as the Contract executed by the BPA in this case. § 622.103(b)(1). Although this regulation seems to point to a DOE belief that the CDA does not

apply to these contracts, it does not state specifically that this is the case. The CDA's own language certainly does not prevent its application to these sales. *See* 41 U.S.C. § 602(a).

**14.** Under the present version of the CDA, a contractor must make its claim within 6 years of the accrual of the claim. When it was first enacted, however, "the CDA provided no limitations period in which claims must be presented (or certified) to the CO." *Board of Governors of Univ. of N.C. v. United States*, 10 Cl.Ct. 27, 30 (1986). The statute of limitations was first included as part of the 1994 amendments to the CDA. 41 U.S.C. § 605(a) (1994), *as amended by* Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, 108 Stat. 3243, 3322 (1994). The 1994 amendments are applicable to contracts awarded on or after October 1, 1995. 48 C.F.R. § 33.206(b) (2000). The regulations provide that there will be no retroactive application of the six-year statute of limitations to contracts awarded before October 1, 1995. *See Motorola, Inc. v. West*, 125 F.3d 1470, 1473 (Fed.Cir.1997). The Contract in this case was awarded on January 28, 1988, and therefore the six-year statute of limitations contained in the 1994 amendments does not apply. *See Sucesion J. Serralles, Inc. v. United States*, 46 Fed.Cl. 773, 783 (2000).

over $50,000 must be certified by the contractor that it has made the claim in good faith, that the supporting data and payment requested are accurate, and that the person certifying the claim has authority to do so. 41 U.S.C. § 605(c)(1).[15] A response from the CO is required within 60 days. 41 U.S.C. § 605(c)(2). Once the claim is denied or the CO neglects to respond within 60 days to a claim, the contractor may institute judicial proceedings. 41 U.S.C. § 605(c)(2), (5).

Defendant argues that because the CDA applies to this Contract, the court cannot hear plaintiff's claims because plaintiff did not submit the claims first to the CO, and did not certify any claim that may have been made. Plaintiff takes no position on whether the CDA applies in this case. It explains nevertheless that if the CDA does apply, plaintiff has provided a properly certified claim for the issues in Count I, and a claim that is easily curable for the issues in Count II.[16]

 First, the court must determine whether plaintiff submitted a written claim to the CO assigned to the contract for a decision. 41 U.S.C. § 605(a). The CDA does not specify what constitutes a valid "claim." The pertinent provision in the Federal Acquisition Regulation (FAR), however, does define the term:

> Claim, as used in this subpart, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought

by the claimant. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 [$50,000 for pre–1995 contracts] is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and 33.207. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

48 C.F.R. § 33.201 (2000). In *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995) (*en banc*), the United States Court of Appeals for the Federal Circuit (Federal Circuit) created a test to determine whether such a claim exists. The FAR expressly excludes a "routine request for payment" from the definition of claim. The court must therefore first ascertain whether the request for payment is routine or nonroutine. *Id.* at 1576–77. If the request is nonroutine, the test requires it to be a written demand, seeking, as a matter of right, the payment of money in a sum certain. *Id.* at 1575. The claim must explicitly or implicitly request a contracting officer's final decision. *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1542 (Fed.Cir.1996). No dispute need exist at the time of submission for the nonroutine request to be considered a claim. *Reflectone*, 60 F.3d at 1576.

 If the request for payment is routine, then different requirements apply. *Id.* at 1577–78. Under the FAR's definition, there must exist a dispute at the time of submission or unreasonable government delay in paying the request, and the contractor must provide written notice to the CO that it is

---

**15.** The 1994 amendments also changed the money amount in the certification requirement from $50,000 to $100,000. 41 U.S.C. § 605(c)(1) (1994). Both of plaintiff's claims exceed $100,000, so certification would be required under the original and amended versions.

**16.** In this case, plaintiff and defendant did not treat the Contract as an agreement that would be subject to the CDA if a dispute arose. Indeed, plaintiff asserts that counsel for defendant told plaintiff's counsel specifically that claims would

not be considered pursuant to CDA standards. Although plaintiff's counsel most likely did not have the jurisdictional prerequisites in mind when it tried to resolve the dispute with defendant, the CDA does not require the realization of a claimant that it is meeting the CDA's requirements; instead, the only determination the court must make is whether plaintiff's actions in this case combine into a properly submitted CDA claim.

submitting a claim. Only then will the routine request for payment transform into a claim under the CDA. *See id.,* 60 F.3d at 1578; 48 C.F.R. § 33.201.

Plaintiff's letter to the CO on March 11, 1998, constitutes its alleged claim. The letter is nonroutine in nature; it is not a normal request for payment under the regular operation of the Contract such as an invoice or other regularly recognized form. Instead the letter describes both an ongoing dispute between plaintiff and defendant, and plaintiff's wish that it be compensated for what it saw as defendant's breach of the Contract. The claim must therefore meet the requirements for a nonroutine request for payment to be considered a claim for jurisdictional purposes under the CDA.

As concerns both Count I, based on the unlawful conversion of modes of the Contract's operation, and Count II, based on the misapplication of new rates charged for power to plaintiff, the letter is a demand for payment submitted in writing.[17] Plaintiff claimed a sum certain under Count I totaling $582,758. Plaintiff based this figure on what it believed was a breach of contract by defendant, asking that it rightfully be restored to its deserved position had the breach not occurred. Plaintiff asked for a decision from the CO, stating "Therefore, Burbank respectfully claims a credit for that amount of damages."[18] Although subsequent correspondence between the two parties indicated plaintiff's willingness to attempt a settlement, this alone will not obviate the validity of the original claim. *Scan–Tech Sec., L.P. v. United States,* 46 Fed.Cl. 326, 334 (2000) (citing *Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1577–78 (Fed.Cir.1992), *overruled on other grounds, Reflectone,* 60 F.3d at 1579).[19] The damages specified under Count I were the subject of a valid claim to the CO.

Regarding Count II, however, plaintiff's claim is not as well-articulated, nor does it involve a specific sum that plaintiff is asking

from defendant. Indeed, plaintiff has conceded that for purposes of the CDA it would have to resubmit the claim "to the contracting officer for a decision before the decision or lack thereof could be appealed to this Court."[20] Count II of plaintiff's Complaint therefore does not meet the test for a valid claim under the CDA's requirements, and cannot remain properly before the court.

██ Next, the court must decide whether plaintiff properly certified its claims to the CO, as both claims amounted to more than $50,000. The version of the CDA applicable to the Contract stated that for claims of more than $50,000, the contractor must

> certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c)(1). The purpose of the certification requirement is to deter unwarranted or inflated claims by creating clear liability for fraudulent demands for payment. *Transamerica,* 973 F.2d at 1579. A certification under the CDA must be made clearly and completely. *Robin Indus., Inc. v. United States,* 22 Cl.Ct. 448, 455–56 (1991). A contractor making its claim to the CO must meet the requirements for certification simultaneously in one document, and not in a piecemeal fashion. *D.L. Braughler Co. v. West,* 127 F.3d 1476, 1480 (Fed.Cir.1997); *Scan–Tech,* 46 Fed.Cl. at 335; *Medina Constr., Ltd. v. United States,* 43 Fed.Cl. 537, 546 (1999). Although a defective certification may be cured subsequent to the filing of a CDA claim in this court, a lack of any certification before filing cannot be waived and no cure will be allowed. *J & E Salvage Co. v. United States,* 37 Fed.Cl. 256, 261 n. 4 (1997), *aff'd,* 152 F.3d 945 (Fed.Cir.), *cert. denied,*

---

17. Plaintiff's Opposition (Pl.'s Opp.) to Defendant's Motion to Dismiss, Exhibit (Exh.) A–3, letter from Dennis A. Barlow, City of Burbank Office of the City Attorney to Kimberly Leathley, Bonneville Power Administration, Mar. 11, 1998.

18. Pl.'s Opp., Exh. A–3 at 5.

19. *See* Pl.'s Opp., Exh. A–7 at 1.

20. Pl.'s Opp. at 9.

525 U.S. 827, 119 S.Ct. 76, 142 L.Ed.2d 59 (1998).

Plaintiff asserts that it "constructively" certified its claims. It states that it was responsive to an earlier letter from defendant which disputed the bases for the claims, providing documentation explaining the reasons for their demand of payment. Plaintiff avers that it reduced its request of payment after it made its claims to the CO. Plaintiff also states that defendant treated its claims as certified. Plaintiff argues that these facts, when put together, amount to a certification for the CDA's purposes. It cannot, however, point to any part of its claims that articulate certification clearly and completely. Certainly, plaintiff has done nothing to show that it submitted a claim in bad faith or in a fraudulent manner. There exists, nonetheless, no simultaneous complete certification within plaintiff's claims. Although plaintiff attempts to provide proper certification in its briefs, as explained above, the absence of certification to a claim cannot be cured. The fact that the CO treated the claim as complete and did not alert plaintiff to its failure to certify its claims does not aid plaintiff's cause, because even if a CO purports to make a final decision on a defective claim, such decision is a legal nullity. *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338 (Fed.Cir.1983). Plaintiff's Count I therefore lacks certification under the CDA's requirements, and cannot at this time be heard in this court.

### Conclusion

For the above-stated reasons, plaintiff's claims fall under the exclusive jurisdiction preserved for the Ninth Circuit under the Regional Act. The clerk is ordered to dismiss plaintiff's complaint.

*Arguendo*, if the Regional Act does not divest this court of jurisdiction, the claims are subject to the CDA. Therefore, defendant's motion to dismiss Count I is granted. Count I is dismissed without prejudice due to lack of the claim certification required by the CDA. Also, defendant's motion to dismiss Count II is granted. Count II is dismissed without prejudice due to the failure to submit a proper claim as required by the CDA.

No costs.

**IT IS SO ORDERED.**