**PUGET SOUND ENERGY, INC.,**
**a Washington corporation,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–421C.**

United States Court of Federal Claims.

Sept. 11, 2000.

 

Richard W. Oehler, Seattle, Washington, for plaintiff.

Reginald T. Blades, Jr., U.S. Department of Justice, Washington, D.C., for defendant.

## *OPINION*

BASKIR, Chief Judge.

This case is currently before us on defendant Bonneville Power Administration's (Bonneville or BPA) motion to dismiss on jurisdictional grounds the complaint of plaintiff, Puget Sound Energy, Inc. (Puget), disputing construction costs of the Pacific Northwest AC Intertie. Defendant's motion is granted. However, in lieu of dismissal, the complaint is to be transferred to the United States Court of Appeals for the Ninth Circuit pursuant to 28 U.S.C. § 1631.

### I. *Background of the Dispute*

Puget Sound is primarily a public utility, providing energy to residential and business users in the Washington State area. The Bonneville Power Administration is an agency of the United States that sells electrical power generated throughout the Pacific Northwest. For a detailed discussion of the history of the BPA see *Puget Sound Power & Light Co. v. United States,* 23 Cl.Ct. 46, 48 (1991).

On July 1, 1999, Puget filed a complaint in this Court alleging a breach by defendant of the Pacific Northwest AC ("alternating current") Intertie Capacity Ownership Agreement. The Third AC Intertie is part of the Pacific Northwest AC Intertie, which is an electric power transmission line that provides north-to-south and south-to-north power transmission capacity between the Pacific Northwest and the California–Oregon border. Pursuant to the Capacity Rate Schedule, CO–94, incorporated in the Capacity Ownership Agreement, Puget and other Capacity Owners paid a share of the Third AC Intertie construction costs. The agreement sets forth the items which the parties agreed should make up the reimbursable construction costs.

The parties dispute the bill. Puget contends this Court has jurisdiction over the disagreement under the Tucker Act's grant regarding contract disputes. By contrast, BPA contends this is really a dispute over the rate Puget is to pay, the CO–94 rate, and thus is governed by the Northwest Power Act's special jurisdictional grant to the United States Court of Appeals for the Ninth Circuit.

The CO–94 rate schedule and the ratemaking procedure that established it were preceded by discussions between Bonneville, Puget, and other capacity owners. On September 18, 1991, Bonneville and Puget executed a memorandum of understanding which set out the pricing methodology for transmission capacity ownership and which was subsequently incorporated in the CO–94 rate. In the memorandum, Puget agreed not to challenge the ratemaking proceeding if Bonneville used the memorandum's pricing methodology.

Puget pays Bonneville for capacity ownership rights for 400 megawatts in accordance with the CO–94 rate schedule. The CO–94 rate schedule was established on the record in the formal rate proceeding in which Puget participated, held pursuant to the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h (Northwest Power Act or Act) (all section references hereafter, unless otherwise specified, are to 16 U.S.C.). On March 25, 1994, Bonneville issued a Final Record of Decision which adopted the CO–94 rate schedule and included estimates of Bonneville's Third AC Intertie Project costs, including overhead. The Federal Energy Regulatory Commission ("FERC") gave interim approval on May 9, 1994, and final approval on June 20, 1994.

The CO–94 rate schedule provided that upon completion of the Third AC Intertie Project, Bonneville would adjust Puget's initial lump sum payment to reflect the actual cost of construction, what the parties inelegantly refer to as "true-up to actuals." Bonneville did this calculation on December 29, 1995, and provided a refund to Puget. Later, on September 15, 1997, the Capacity Owners commenced an audit as was their right under the Capacity Agreement; on January 16, 1998, they submitted a draft audit report to Bonneville seeking a further refund. The report questioned overhead construction charges attributed to another Capacity Owner's facilities, spare parts charges, and certain capitalized construction costs. Bonneville agreed to refund certain expenses on February 20, 1998, but not others. On May 7, 1998, the Capacity Owners submitted a final audit report and a rebuttal to Bonneville's response to their draft audit report. Bonneville sent a second letter on June 4, 1998, restating its position that the charges at issue were proper. Bonneville subsequently sent a third letter on May 19, 1999, noting, apparently for the first time, that the dispute involved a challenge to ratemaking subject to exclusive Ninth Circuit review.

We turn next to examine the Act, and cases that have interpreted its jurisdictional provisions.

## II. *The Statutory Scheme and Judicial Review*

The Northwest Power Act governs the sale of power and its transmission; the establishment of rates; administration of regional and extra-regional preference for power; and methods for administrative and judicial review of Bonneville's actions. The Act governs the establishment of Bonneville's rates for the sale of electric power and for the transmission of non-Federal power over the Federal transmission system. The Act requires Bonneville to review and adjust its rates to recover its costs:

> The administration shall establish, and periodically review and revise, rates for the sale and disposition of electric energy and capacity and for the transmission of non-Federal power. Such rates shall be established and, as appropriate, revised to recover, in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power, including the amortization of the Federal investment ... over a reasonable period of years and the other costs and expenses incurred by the Administrator pursuant to this chapter and other provisions of law.

Section 839e(a)(1). Pursuant to the Northwest Power Act, FERC reviews Bonneville's rates. Section 839e(a)(2).

Section 839f(e) of the Act governs judicial review of Bonneville's final rate setting actions, and its implementation of final actions and certain other disputes. This includes "final rate determinations under section 7 [of the Northwest Power Act]." Section 839f(e)(1)(G). And rate determinations are final "upon confirmation and approval by the Federal Energy Regulatory Commission." Section 839(f)(e)(4). Of greatest significance here is Section 839f(e)(5) which provides that suits challenging action under the Act "be filed in the U.S. Court of Appeals for the region," that is, the Ninth Circuit:

> Suits to challenge the constitutionality of this chapter, or any action taken thereunder, *final actions and decisions* taken pursuant to this chapter by the Administrator or the Council, or *the implementation of such final actions* [brought under the Act or under three other acts] ... shall be filed in the United States Court of Appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final . . . .

(emphasis added).

The Circuit's jurisdiction, however, is not plenary. Section 839f(e)5 also states that "any other actions" may be brought in the "appropriate court." As a consequence, it is not a simple matter to decide when a case subject to Section 839f(e)(5) is assigned to the Circuit, and when it is lodged, for example, in this Court.

Section 839f(e)(5) specifies four distinct categories of events or claims within the Circuit's jurisdiction: Constitutional challenges to the Act, final actions, decisions by the Administration or Council, and implementations of final actions. The first category is not implicated here, but one or more of the remaining categories may be.

Section 839f(e)(1) sets forth eight specific "final actions" under the Act: Adoption of the regional plan and program, sales and exchanges of power, acquisition of resources, implementation of conservation measures, execution of contracts of assistance to sponsors, granting of credits, rate determinations and rulemaking.

Subsection (2) then defines "the record on review of these final actions" as that provided in the chapter. For example, reviews of rates under Section 839e are determined by the rulemaking record pursuant to Section 839(e)(i). See specifically the procedure that must be followed in setting rates. Section 839e(a). However, under Section 839d only the acquisition of "major resources" requires a formal hearing and record; not so for the acquisition of non-major resources. *Compare* Section 839d(c) with Section 839d(d). But the specific final actions listed under subsection (1) are not exclusive. Subsection (3) states the enumeration under subsection (1) does not preclude "judicial review of other final actions and decisions of the Council or Administrator." There is no corresponding prescription of the record on review for this catch-all.

The statute is not helpful in defining the remaining categories of events within Ninth Circuit jurisdiction. And there are no other definitions of the record on review. This billing dispute may easily be described as another final action or decision of the Administrator or as an implementation of a ratemaking procedure under the Act, or both. The Webster's Third International Dictionary defines "implementation" as the act of carrying out, fulfilling, accomplishing—to give practical effect to and ensure actual fulfillment by concrete measures. Certainly the true-up to actual costs of the rate set for construction of the Third Intertie is an implementation of the CO-94 construction rate.

This statutory exposition is reinforced by an examination of the jurisdictional litigation over the Act.

### III. *True Nature of Puget's Complaint*

There have been at least seven major cases with relevant circumstances exploring the issue of jurisdiction; the most recent that of *City of Burbank v. United States,* 47 Fed. Cl. 261 (2000), decided just a few weeks ago. With one exception, *Pub. Util. Dist. No. 1 of Clark County v. Johnson,* 855 F.2d 647 (9th Cir.1988) (*Clark County* ), all have decided in favor of Ninth Circuit jurisdiction. Interest-

ingly, Puget or its predecessor has been a plaintiff in four of these cases, and in each case that Puget itself argued for contract based jurisdiction, the court ruled in favor of the Ninth Circuit's jurisdiction. For example, in *Pacific Power and Light Company v. BPA*, 795 F.2d 810, 816 (9th Cir.1986), the plaintiffs sought a declaratory judgment that Bonneville's approval of a new average cost methodology was a breach of contract. The plaintiffs' appealed from the district court's finding that it did not have jurisdiction. Announcing the "true nature" test, the Ninth Circuit found that even though the action was based upon contracts with Bonneville, the challenge was to Bonneville's ratemaking proceedings, and therefore jurisdiction was exclusively in the Ninth Circuit. The Court found that the critical questions for deciding jurisdiction are: What is the agency being attacked and what is the true nature of the challenged agency action?

■ In construing the true nature of a claim we look to the real underlying claim, not how the plaintiff frames it. The Ninth Circuit described the test in the following words:

> In § 839f(e)(5), Congress has decided that jurisdiction under the Act should be a function of the agency whose actions are being challenged rather than a function of the cause of action which petitioner asserts. This jurisdictional scheme is consistent with myriad statutes which confer original jurisdiction on courts of appeals based upon the agency being attacked.
>
> ... For jurisdictional purposes, therefore, it matters not whether the utilities' suit is grounded in contract, administrative law, or some other legal theory. Instead, jurisdiction arises because the actions of a particular agency are being challenged and because of the nature of the agency action at issue. The proper inquiry focuses on the agency being attacked and whether the factual basis for that attack is an agency action authorized by the Act.

*Pacific Power & Light Co. v. BPA*, 795 F.2d at 816.

The recent opinion of our Court characterizes the Ninth Circuit test as follows:

The appropriate test is therefore to determine whether a claim is challenging either BPA action "taken pursuant to statutory authority," or action that constitutes "contractual commitments" made outside the statutory requirements of the Regional Act... Only when claims are found to be based on actions wholly outside the statutory authority of the Regional Act will the Ninth Circuit's exclusive jurisdiction fail to encompass such claims.

*City of Burbank*, 47 Fed.Cl. at 266–67 (citations omitted).

■ In *Burbank*, the plaintiff asserted that Bonneville breached a contract it had with plaintiff by failing to adhere to the contract's provisions regarding: (1) conversion and reversion between the contract's two different "modes" of operation; and (2) application of new rates for the sale of power to plaintiff. The Court found plaintiff's claim, however, was in fact a challenge to the Northwest Power Act and, therefore, exclusively within jurisdiction of the Ninth Circuit. The Court stated:

> The contractual provisions concerning application of rates are based directly on the requirements of the Regional Act and the BPA's rate schedules. The alleged misapplication is therefore a final action pursuant to statutory authority, and is not purely contractual in nature.

*City of Burbank*, 47 Fed.Cl. at 268.

In a number of the Ninth Circuit cases, the petitioner, including Puget, couched a rate challenge, as it does here, as a breach of contract claim. In a case similar to ours, *CP National Corp. v. Jura*, 876 F.2d 745, 747 (9th Cir.1989), the plaintiffs alleged that a charge for available power established in a 1983 rate process, as opposed to power actually used, was a breach of contract. The Ninth Circuit, however, denied the plaintiffs' motion to transfer the case to the Court of Claims, finding the case was really a challenge to Bonneville's rate setting:

> Under the [Northwest Power Act], final rate determinations are "final actions" by the BPA, and challenges to such rate determinations must be filed in this court .... We have consistently exercised jurisdiction where the action being challenged

is in reality final ratemaking pursuant to BPA's statutory authority, regardless of the petitioner's characterization of its claim .... [T]his court has exclusive jurisdiction over what is in reality a challenge to final action of the BPA taken pursuant to statutory authority. *CP National*, 876 F.2d at 747–48.

And, in *Puget Sound Power & Light Co. v. United States*, 23 Cl.Ct. 46 (1991), Puget challenged Bonneville's extra regional sale of surplus power. The Claims Court ruled that even if Puget's claim was founded upon a contract the Court lacked jurisdiction because the Northwest Power Act placed jurisdiction exclusively in the Ninth Circuit.

Each of these cases in which Puget participated pre-dated or was contemporaneous with the memorandum of understanding it signed in September 1991. Together with other case law at the time, with only the possible exception of *Clark County*, these rulings would have informed a prudent party of the Ninth Circuit's broad jurisdiction under the Act. *See, also, Central Montana Elec. Power Coop., Inc., et al. v. Bonneville*, 840 F.2d 1472 (9th Cir.1988) (Bonneville's denial of power allocation requests was within Ninth Circuit's broad grant of jurisdiction); and *Forelaws on Board v. Johnson*, 709 F.2d 1310 (9th Cir.1983) (challenge to execution of power contract allegedly in violation of an environmental statute not cited in Northwest Power Act, nonetheless within exclusive jurisdiction of Ninth Circuit). Given this body of law, it is more than passing strange that Puget is still litigating—still unsuccessfully—this jurisdictional issue.

Despite Puget's characterization of its claim as one for breach of contract, it is actually a claim challenging Bonneville's rate and its implementation. Puget's complaint alleges that the defendant, upon making Adjustment to Reflect Actual Construction Costs, improperly included certain items or expenses. Puget is thus challenging Bonneville's determination of the cost it is required to pay under the Act for capacity ownership rights. This cost was determined pursuant to the CO–94 rate schedule. At bottom, then, it challenges the rate it must pay; more particularly, it challenges the calculation of the rate it must pay.

As the Court stated in *City of Burbank:*

It is not enough to argue, however, merely that contract language touches on the issues that form the substance of the claims. The inquiry must proceed one step further: the court must determine whether the contractual provisions themselves were included pursuant to statutory authority and mandate.

*City of Burbank v. United States*, 47 Fed.Cl. at 267.

The language of the Capacity Ownership Agreement repeatedly makes clear that the cost is determined based on the CO–94 rate. Section 1(a) of the Capacity Ownership Agreement defines "Adjusted Capacity Ownership Price" as "the price calculated pursuant to column 2, section B of Exhibit D and section IV.B. of the CO–94 rate in Exhibit A." Even Section B of Exhibit D, however, does not state how the adjustment is calculated. Rather it states: "Initial, Adjusted and Revised Adjusted Capacity Ownership Price are determined in accordance with the CO–94 rate in Exhibit A." Exhibit D contains the following further language indicating the CO–94 rate determines the revised, final price: "Adjusted Lump Sum Payment is calculated in accordance with the CO–94 Rate in Exhibit A" and "Revised Adjusted Lump Sum Payments is calculated in accordance with the CO–94 rate in Exhibit A." Puget cannot escape the plain words of its contract, which expressly describes the "true-up" as a CO–94 process. There is no room for doubt that jurisdiction over this dispute lies in the Circuit Court.

\* \* \* \* \* \*

Congress specifically intended in the Northwest Power Act to place review of final decisions by the BPA exclusively in the Ninth Circuit to avoid conflicting judicial interpretations among various federal courts. *Forelaws*, 709 F.2d at 1313 (the bifurcation of court review could result in the same agency decision being reviewed simultaneously at two different levels); *Pacific Power & Light Co.*, 795 F.2d at 815 ("[o]riginal jurisdiction in [the court of appeals] permits uniform interpretation of the Act and promotes expe-

dited review"). This includes the need for consistency in the resolution of disputes over the payment of rate bills.

## IV.  *Puget's Arguments*

Puget raises a number of arguments to support the contention that this Court is the proper forum for its dispute with Bonneville. Puget argues that its claims are not based on an administrative record and therefore its suit is not appropriate for the Ninth Circuit. It also argues that the ratemaking hearing and record do not have sufficient specificity for a Ninth Circuit review. Puget further argues that it had an agreement with Bonneville that the type of claim which is currently at issue would be treated as a contract claim within the jurisdiction of this Court. And, finally, Puget argues that this must be the appropriate Court to hear its suit because the statute of limitations has already run for it to bring a claim before the Ninth Circuit. We discuss the arguments in turn.

### A.  *Administrative Record*

Puget seems to argue that a formal administrative record, presumably based on a formal hearing, is needed for Ninth Circuit jurisdiction. In the absence of a formal administrative record, Puget's claim must be viewed as a pure breach of contract claim not subject to Ninth Circuit jurisdiction. Puget states that "there is no administrative record regarding Bonneville's decision to include Double Overhead and Spare Parts costs in its 'true-up to actuals,' and therefore there is no administrative record for the Ninth Circuit to review under the Northwest Power Act." Plaintiff's Brief at 46.  We do not find any support for the proposition that a Ninth Circuit challenge must be premised on a formal administrative record.

Puget contends that the Ninth Circuit has in one opinion taken the position that it has initial and exclusive jurisdiction only where the claim was based on a formal administrative record.  *Pub. Util. Dist. No. 1 of Clark County*, 855 F.2d at 650.  Plaintiff contends that the facts underlying its claim are not in the formal ratemaking administrative record, but in the Capacity Agreement and in the details of the dispute.

In *Clark County*, the plaintiff asserted a claim based on Bonneville's failure to honor a contract to purchase power from plaintiff. The Ninth Circuit found that this was not a claim regarding a final action by Bonneville taken pursuant to statutory authority, but rather a contract claim.  The *Clark County* court did indicate that a "final action" claim needs to be based on an administrative record.

> Pursuant to Congress' jurisdictional grant of authority, we have consistently reviewed final agency action under the Regional Act on the basis of the record developed before the agency ... This court has never reviewed a breach of contract claim based upon alleged facts outside the administrative record of an agency action under the Act.

855 F.2d at 649.

We think Puget over-reads *Clark County*. Puget implies that *Clark County's* references to "final action" and "administrative record" mean the formal Record of Decision in a statutory ratemaking procedure.  This case does not define "administrative record" in such a formal and limited way, and Puget has not directed us to any authority that does. As we have seen, the statute defines the record on review for eight listed final actions (Sections 839f(e)(1) and (e)(2)), but has no similar requirements for the unspecified "other final actions," Section 839f(e)(3).  A formal administrative record "in accordance with this chapter" is clearly not necessary for all Ninth Circuit jurisdiction.

At bottom, Puget's analysis of *Clark County* runs counter to the Ninth Circuit's test for determining jurisdiction.  Puget's focus on the existence of a formal administrative record as the test is really a focus on the nature of the proof or evidence employed to resolve the claim.  It is not a focus on the nature of the claim itself.

On the other hand, if we assume the necessity of a formal administrative record as a prerequisite for Ninth Circuit jurisdiction, we have one in the ratemaking which produced the CO–94 rate.  Unlike the plaintiff in *Clark County*, Puget is indeed challenging Bonneville's rate, which has its foundation in the

CO–94 administrative record. The Bonneville Administrator's Final Record of Decision in the Non–Federal Capacity Ownership Rate Proposal (Final ROD) addresses this Adjustment to Reflect Actual Construction Costs. For example, the Final ROD states:

> An adjustment will be made between the initial lump sum payment and the actual capital and related costs approximately two years after commercial operation of the Third AC Intertie or as soon as practicable after all costs are available. The lump sum payment will be adjusted to reflect the differences between the estimated and actual costs for the construction of the facilities specifically identified for the second 800 MW increment, including actual AFUDC. The book value of $19.1 million for existing support facilities will not be adjusted. Capacity Owners would either receive a refund, with interest from BPA or make an additional payment, with interest, to BPA of the difference between the lump sum payment and the actual Capacity Ownership Price.

Final ROD at 18–19 (citations omitted). Thus, if a formal Record of Decision is necessary under Puget's reading of *Clark County*, that test is met.

### B. *Specificity of the Administrative Record*

But Puget asserts in oral argument that the administrative record of the CO–94 hearing is not sufficiently detailed to resolve its claims. That is, the CO–94 hearing only laid out the general billing plan, but not how to calculate the precise components. Puget suggests as a rule that if the administrative record is worded only in general terms, as is CO–94, compared with the specificity of the Ownership Agreement, the matter is contractual, and the jurisdiction lies with our Court. If, on the other hand, the administrative record is sufficiently detailed for resolution of the dispute, the matter lies with the Circuit Court. Puget would have us look to the material relied upon to resolve the dispute—the most helpful evidence—not the "true nature of the claim."

First, we find nothing in the Northwest Power Act or the jurisdictional cases that suggests the specificity of the administrative record is the test for whether Bonneville's conduct is a statutory action. Nor has plaintiff shown us otherwise.

Second, what amounts to "sufficient specificity" of an administrative record is inherently a subjective determination. If courts were to apply this subjective "specificity" test it would result in inconsistent jurisdiction determinations, and thereby undermine Congress' desire for *uniform* interpretations of the Northwest Power Act.

Finally, this argument is flawed because it once again suggests a test founded on the nature of the evidence offered to support a claim; not on the nature of the claim itself. Ninth Circuit jurisdiction does not preclude discovery of other evidence bearing on the dispute. See *Forelaws,* 709 F.2d at 1313.

### C. *The Parties' Agreement on Jurisdiction*

Plaintiff argues that the Capacity Agreement contemplated plaintiff's right to litigate post-audit contract claims in other forums. This is a fair reading of the contract. Indeed, Bonneville wrote an internal memorandum on May 5, 1994, noting that in the Agreement it was "allowing binding arbitration of Bonneville's rates rather than requiring disputes to be resolved in the Ninth Circuit Court." Furthermore, plaintiff's assertion that Bonneville itself believed until May 1999 that these types of disputes would be treated as contract claims within this Court's jurisdiction seems credible.

■ Although the government disputes these interpretations and inferences, even the most sympathetic of readings avails plaintiff nothing. Unfortunately, a federal agency, no more than any other litigant, cannot contract around a statutory grant of jurisdiction, nor imbue this Court with jurisdiction when it has none. *Insurance Corporation of Ireland v. Compagnie des Bauxites,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982):

> Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of

the federal sovereign. Certain legal consequences directly follow from this. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court.

### D. *Impossibility*

Finally, plaintiff argues that since the 90–day limitations period in Section 839f(e)(5) is unfair as applied to this case, we should exercise jurisdiction. Puget asserts that it was impossible to bring a claim within 90 days of the FERC's approval of CO–94 because the dispute did not exist until later. That is certainly true.

But, as we have seen, the kinds of events subject to the Ninth Circuit review are not limited to formal ratemaking "final actions." The statute also refers to "final actions and decisions taken pursuant to this chapter by the Administrator or the Council" and "the implementation of such final actions." The dispute here is not about the legitimacy of the CO–94 rate, but in its implementation, or in the decision of the Administrator in calculating the Intertie "true-up to costs."

Those "final actions," "decisions" and "implementations" do not necessarily involve FERC approval and the limitation period is not governed by the date of FERC's approval of the CO–94 rate. And the Northwest Power Act specifically provides that statute of limitations for actions begins when they are "deemed final." While a ratemaking itself might be deemed final on FERC approval, one would hardly "deem final" BPA's billing decision as of the date the CO–94 rate was initially approved.

### V. *Transfer*

Since we have determined that jurisdiction lies in the Ninth Circuit, we must address the issue of transfer. The statute governing transfers of cases to cure lack of jurisdiction is 28 U.S.C. § 1631, which provides:

> Whenever a civil action is filed in a court .... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed,

and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

Generally, under Section 1631, we would have to determine whether the claim we wish to transfer could "have been brought" in the other court before we transfer it there. As we have observed, the Northwest Power Act assigns interpretation of the Act to the Ninth Circuit. Only by leaving the interpretation of the statutory "deemed final" phrase to the forum assigned that function can we be faithful both to the statute and to Congress' intention that there be consistency in its interpretations. *Forelaws*, 709 F.2d at 1313. We therefore commend to the Ninth Circuit the determination whether Puget's claim was filed within 90 days of the date the dispute is "deemed final."

### VI. *Conclusion*

For these reasons, the Government's motion to dismiss for lack of jurisdiction is granted, but in lieu of dismissal, this case is to be transferred to the U.S. Court of Appeals for the Ninth Circuit pursuant to § 28 U.S.C. § 1631. The Clerk is directed to enter judgment accordingly. Each party is to bear its own costs.

IT IS SO ORDERED.