VANALCO, INC., a Delaware Corporation, Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 00–459 C.

United States Court of Federal Claims.

Oct. 19, 2000.

Michael J. Uda, Helena, Montana, for the Plaintiff.

Armando O. Bonilla, Washington, D.C., with whom were Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the Defendant.

## OPINION

BUSH, Judge.

This matter, before this court on the defendant's motion to dismiss, involves a power sales contract between Bonneville Power Administration (Bonneville or BPA) and Vanalco, Inc. (Vanalco). In this litigation, plaintiff Vanalco alleges BPA's failure to offer it the same amendments as it did to other utilities constitutes a breach of contract and breach of the implied covenant of good faith and fair dealing. On August 8, 2000, Vanalco moved for expedited proceedings to resolve the issue of subject matter jurisdiction. The court agreed to implement an expedited schedule. On September 6, 2000, the Government filed its 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Vanalco filed its

reply on September 15, 2000. Oral argument was held on September 21, 2000. The Government's motion to dismiss the complaint is granted.

## BACKGROUND [1]

The plaintiff, Vanalco, Inc., is an aluminum manufacturer with its plant located in Vancouver, Washington. Vanalco purchased this aluminum-smelting facility in 1987 from Alcoa, Inc. (Alcoa). In conducting its operations, Vanalco utilizes approximately 230 megawatts of power per year.

The Bonneville Power Administration is a federal agency within the Department of Energy created by Congress in 1937 to market low-cost hydroelectric power in the Pacific Northwest. This agency markets hydroelectric power generated by thirty federal facilities, and several non-federal facilities. Bonneville manages approximately eighty percent of the high-voltage transmissions systems in the area and markets approximately forty percent of the hydroelectric power consumed in the Pacific Northwest. Those entities to which Bonneville markets its power include public and private utilities, federal agencies, and direct service industrial (DSI) customers. DSI customers, of which Vanalco is one, are " '[large] industrial companies engaging in power intensive operations who purchase power directly from [Bonneville] for their own use.' " Motion to Dismiss at 2 (quoting *Association of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1164 (9th Cir.1997)).

Since its inception, BPA has dominated the power supply market in the Pacific Northwest because of the combination of its ability to generate power at a low-cost and its ownership of the majority of the region's high-voltage transmission facilities. *APAC*, 126 F.3d at 1165. In the seventies, however, there were threats that by the end of the decade, BPA would not have sufficient resources to meet the ever-increasing demand for its power. This situation prompted Congress to enact the Pacific Northwest Elec-

1. The defendant has agreed to accept the plaintiff's well-pled factual allegations as true for purposes of the resolution of its pending motion to dismiss. The court has included certain facts presented by the defendant to clarify specific aspects of the background of this dispute.

tric Power Planning and Conservation Act of 1980 (Northwest Power Act or The Act), Pub.L. No. 96–501, 94 Stat. 2697 (1980) (codified at 16 U.S.C. §§ 839–39h (2000)). This Act "governs the sale of power and its transmission; the establishment of rates; administration of regional and extra-regional preference for power; and methods for administrative and judicial review of Bonneville's actions." *Puget Sound Energy, Inc. v. United States,* 47 Fed.Cl. 506 (2000). In an effort to avert disputes over power allocation, BPA was directed pursuant to this statutory directive to offer twenty year power sales contracts with the DSIs.

Accordingly, in 1981, Bonneville entered into twenty year power sales contracts with the DSIs. One of these DSIs, Alcoa, Inc., is Vanalco's predecessor in interest. Vanalco assumed the BPA contract when it purchased the aluminum smelting plant from Alcoa. Vanalco and BPA memorialized this assumption in a 1987 agreement. This agreement expires June 30, 2001. Under the terms of the 1981 contracts, each DSI could, upon written notice, terminate its contract prior to the contract's September 30, 2001 termination date.

Historically, Bonneville's rates for the sale of hydroelectric power were lower than the rates charged by other power suppliers. But as a result of the passage of the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776 (1992) (codified at 16 U.S.C. §§ 824–824m (2000)) and the ensuing increase in competition, that situation began to change. In this Act, Congress authorized the Federal Energy Regulatory Commission to order transmission line owners like Bonneville to permit utilities and independent power producers to access their transmission facilities for wholesale transactions. Simultaneously, with these increasingly low market prices for power, BPA's wholesale power rates began to rise. Contributing to this increase was an escalation in Bonneville's non-owner costs, such as fish and wildlife mitigation. Between 1991 and 1995, Bonneville's annual investment for fish and wildlife

mitigation rose from $150 million to $400 million.

These forces of deregulation and competition began to threaten Bonneville's stable consumer base, particularly in light of the fact that DSI customers such as Vanalco had "relatively liberal" termination provisions in their BPA contracts. Competition for the DSI customers' business was growing increasingly intense, and many of the DSI customers, including Vanalco, were poised to purchase power elsewhere at a lower cost. On September 29, 1995, Vanalco formally notified Bonneville of its intention to exercise its contractual right to terminate its 1981 power sales contract with Bonneville, effective March 31, 1996. On March 13, 1996, Vanalco formally amended the terms of its proposed termination. The effect of this amendment was that BPA would provide Vanalco with only ten megawatts of power— less than five percent of Vanalco's original load.

Since 1996, consistent with the above-referenced amendment to the termination letter, Vanalco has purchased only ten megawatts of power per year from Bonneville under its 1981 power sales contract at Bonneville's 1996 industrial firm power rate. Vanalco has obtained the balance of its power needs from: (1) other suppliers at market rates; or (2) Bonneville's 1996 surplus [2] firm power rate.

At approximately the same time Vanalco elected to purchase only ten megawatts of power per year from Bonneville, other DSIs elected to procure much greater amounts of power and entered Block Sale Contracts with BPA (1996 Block Sale Contracts). These contracts, Vanalco contends, amended the terms and conditions of the 1981 long-term contracts. According to plaintiff, the Record of Decision for the Block Sale Contract clearly states that a DSI's decision to enter into a Block Sale Contract will not alter its right to receive power in the period commencing on September 30, 2001.

On March 11, 1997, BPA commenced the process of ascertaining the quantities and

---

**2.** Surplus power is energy generated that transcends the amount necessary for BPA to fulfill its long-term contractual obligations. The rate for

surplus power typically coincides with pervading market prices.

prices of power that BPA would offer its customers in the post-September 30, 2001 rate period. Plaintiff Vanalco participated in this process. BPA has expressed its intention to offer five-year power sales contracts to the DSI customers, including Vanalco. BPA has set forth a proposed allocation of 1,500 megawatts of power to be allocated amongst the total class of DSIs. Of particular concern in this case is the manner in which BPA intends to allocate these 1,500 megawatts. In December of 1998, BPA issued a Record of Decision for the Subscription Strategy Process, wherein, according to plaintiff, it confirmed that it intended to base sales of power in the post-September 30, 2001 period on the amounts that the DSIs contracted to purchase under the 1996 Block Sale Contracts. Under this proposed allocation, Vanalco will receive only a small allocation. This is so because as discussed *supra*, Vanalco declined to enter into a 1996 Block Sale Contract and instead chose to reduce the amount of power it would purchase from BPA from 235 megawatts down to 10 megawatts.

Vanalco alleges that BPA's actions in this regard constitute breaches of the Most Favored Nation Provision of the 1981 contract and the 1987 agreements between Vanalco and BPA. This provision provides:

> If Bonneville offers to enter into a written amendment of any other Industrial Purchaser's power sales contract, other than informal arrangements between the parties referred to in subsection (b) above, Bonneville shall offer to the Purchaser [Vanalco] a corresponding amendment of this contract, to the extent such a corresponding amendment would be applicable to the Purchaser under this contract. Bonneville shall advise and use reasonable efforts to consult with the Purchaser during the development or consideration of any offer to enter into such amendments.

Complaint at ¶ 7 (quoting Ex. 1, 1981 PSC, § 13(c); Ex. 2, 1987 amendment, § 13(c)).

Vanalco states that on July 18, 1999, BPA offered a written settlement to the DSIs that supported using the 1996 Block Sale Contracts as the basis for allocating power in the post-September 30, 2001 period. This pro-posal was reduced to writing and executed by BPA and the signatory DSIs on or around July 18, 1999. Vanalco alleges these actions constitute a breach of its 1981 contract.

BPA's long-term contract with Vanalco will expire on or before September 30, 2001. This being so, BPA has opened a "Subscription Window" (Window) for entering into new contracts for the period commencing after September 30, 2001. This Window opened on April 27, 2000 and is scheduled to close on October 31, 2000. On July 19, 2000, Vanalco wrote to BPA and requested that BPA offer Vanalco a Block Sale Contract under which it would receive an amount of power proportionate to that of the DSIs who signed the 1996 Block Sale Contracts. On August 3, 2000, BPA denied this request via letter.

Vanalco filed its Complaint on August 2, 2000, wherein it seeks: (1) judgment against defendant "for breach of contract and breach of the implied covenant of good faith and fair dealing, and for such direct, consequential, and other damages caused by BPA's conduct as may be proven at trial;" (2) judgment against defendant BPA for damages "directly and proximately caused by Defendant BPA's tortious breach of the implied covenant of good faith and fair dealing;" and (3) "such other relief as is warranted in law or equity." Complaint at 13–14.

On August 8, 2000, Vanalco moved for expedited proceedings to resolve, *inter alia*, the issue of subject matter jurisdiction. On August 11, 2000, the court held a telephone conference in which counsel for the respective parties and the undersigned discussed the foregoing motion. The court agreed to implement an expedited schedule. On September 6, 2000, the Government filed its 12(b)(1) motion to dismiss the complaint for lack of subject matter jurisdiction. Vanalco filed its reply on September 15, 2000. Oral argument was held on September 21, 2000.

## DISCUSSION

### I. Motion to Dismiss for Lack of Subject Matter Jurisdiction—RCFC 12(b)(1)

#### A. Standard of Review

The Government argues that this court should dismiss plaintiff's complaint because,

pursuant to RCFC 12(b)(1) this court lacks jurisdiction to hear Vanalco's claims. RCFC 12(b)(1), which is identical to Rule 12(b)(1) of the Federal Rules of Civil Procedure, provides for dismissal of a claim for a "lack of jurisdiction over the subject matter." FED. R.CIV.P. 12(b)(1); RCFC 12(b)(1). If there is no jurisdiction, this court must dismiss the action.

The party asserting jurisdiction "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence ... [and] must be given an opportunity to be heard before dismissal is ordered." *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). *See also Thomson v. Gaskill*, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed.Cir. 1993). In ruling on a motion to dismiss for lack of subject matter jurisdiction, this court must construe the allegations of the complaint favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). *See also Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir.1989). A decision to dismiss an action for a lack of jurisdiction does not carry *res judicata* effect, and therefore does not present a bar to a subsequent action on the merits in a court of competent jurisdiction. *Do–Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 639 (Fed.Cir.1989); *Maniere v. United States*, 31 Fed.Cl. 410, 419 (1994). Moreover, if the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute. *Reynolds*, 846 F.2d at 747; *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991).

## B. Injunctive relief

The Tucker Act is the primary statute setting forth this court's jurisdiction, and it serves as both a grant of jurisdiction and a waiver of sovereign immunity. *See United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983). This Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the Unit-

ed States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

It is well established that "[c]ourts created by statute can have no jurisdiction but such as the statute confers." *Sheldon v. Sill*, 49 U.S. 441, 449, 8 How. 441, 12 L.Ed. 1147 (1850). A court "may not in any case, even in the interest of justice, extend its jurisdiction where none exists...." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988). An examination of this court's statutory authority reveals that it lacks jurisdiction to entertain the present suit.

The defendant argues in support of its motion to dismiss that this court lacks jurisdiction to entertain Vanalco's claims for specific performance and anticipatory relief. Vanalco concedes that the Government has correctly presented the applicable law concerning this court's general lack of jurisdiction over claims for specific performance and anticipatory damages. The crux of Vanalco's response to the Government's argument is that it does not request an order from this court requiring BPA to enter into a contract with Vanalco and that it seeks a judgment against the defendant for such damages as by be proven *at trial.*

Although plaintiff does not expressly employ terms such as "declaratory judgment" or "specific performance," it appears that these remedies are central to the relief it seeks from this court. This conclusion is buttressed by the fact that plaintiff's complaint is styled "Vanalco's Complaint and Request for Injunctive Relief." Also telling is the fact that Vanalco based its request for expedited review on its belief that "[i]f this motion is not granted it is likely that the federal power subscription window will close before this court can examine the merits of the contract claims." Memorandum in Support of Vanalco's Motion to Establish Jurisdiction at 1. Assuming, *arguendo,* that this

court has jurisdiction to reach the merits of the contract claims, there is no relief other than equitable relief that would minimize the effect of the September 30th (now October 31st) closure of the subscription window. Therefore, it appears that plaintiff's claim does seek equitable relief.

■ As the defendant correctly points out, this court does not have general equitable jurisdiction over contracts. *Logan Canyon Cattle Assoc. v. United States,* 34 Fed.Cl. 165, 168 (1995) (quoting *Nicholson v. United States,* 29 Fed.Cl. 180, 185 (1993)). *See also United States v. King,* 395 U.S. 1, 3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *Rig Masters, Inc. v. United States,* 42 Fed.Cl. 369, 372 (1998) (stating "[i]t is well established that this court does not have jurisdiction over claims for specific performance"); *Hoch v. United States,* 31 Fed.Cl. 111, 114 (1994) (stating "the Court of Federal Claims was created under Article I of the Constitution and has no equitable powers"); *Blackwell v. United States,* 23 Cl.Ct. 746, 750 (1991) (stating this court does not have jurisdiction over claims for specific performance); *Massachusetts Bay Transp. Auth. v. United States,* 21 Cl.Ct. 252, 262, 1990 WL 107736 (1990) (stating this court generally lacks authority to grant requests for declaratory judgments); *Edwards v. United States,* 19 Cl.Ct. 663, 668 n. 5 (1990) (stating this court has no jurisdiction over equitable matters). Accordingly, this court does not have general equitable jurisdiction to entertain plaintiff's claims insofar as they may seek such relief.

■ There are certain limited situations, however, in which this court is authorized to grant equitable relief. *See* 28 U.S.C. §§ 1491(a)(1)-(a)(3). First, this court may grant equitable relief in bid protest cases. *See* 28 U.S.C. § 1491(a)(3); *Landers v. United States,* 39 Fed.Cl. 297, 301 (1997). This case is obviously not a bid protest, and plaintiff has not presented it as such. This court may also grant equitable relief when such relief is merely incidental to plaintiff's claim for money damages. 28 U.S.C. § 1491(a)(2); *Landers,* 39 Fed.Cl. at 301. In this case, however, any equitable relief sought cannot be incidental to plaintiff's claim for money damages because, as discussed *infra,* plaintiff

has not stated a claim for money damages. Moreover, pursuant to the Federal Courts Administration Act this court has jurisdiction over certain non-monetary disputes with a contractor arising under Section 10(a)(1) of the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–13 (1994), including "a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other non-monetary disputes on which a decision of the contracting officer has been issued." *See* 28 U.S.C. § 1491(a)(2). *See also Emery Worldwide Airlines, Inc. v. United States,* 47 Fed.Cl. 461, 467–68 (2000) (stating that plaintiff's requests for declaratory relief were "non-monetary" disputes envisioned by the Federal Courts Administration Act of 1992); Wright and Miller, FEDERAL PRACTICE AND PROCEDURE, § 4101 (Supp.2000).

For purposes of this analysis, the court will assume without deciding that the CDA applies to the sale of electric power and, particularly, the 1981 contract of which plaintiff claims a breach. The CDA sets forth a detailed process that the contractor must comport with prior to instituting suit in this court. 41 U.S.C. §§ 605(a)-(c). *See also City of Burbank v. U.S.,* 47 Fed.Cl. 261, 269–70 (2000). As the court in *Witherington Construction Corp. v. United States,* 45 Fed. Cl. 208, 211 (1999), stated: "[T]o gain a jurisdictional foothold in this [C]ourt, a plaintiff pursuing a contract claim must satisfy two fundamental jurisdictional requirements—it must submit a claim for money presently due and must obtain a 'final decision' on that claim, either actual or deemed." In this case, as the Government correctly points out, Vanalco failed to submit a certified claim to the contracting officer (CO) and await a final decision prior to instituting the present action and, accordingly, any claims for equitable relief cannot fall within the exception to the general bar on this court's equitable jurisdiction carved out by the Federal Courts Administration Act of 1992.

Although the CDA does not delineate the requirements of a claim, its implementing regulations in the FAR do. They provide:

Claim, as used in this subpart, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for relief sought by the claimant. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act and 33.207. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

48 C.F.R. § 33.201 (2000).

The Federal Circuit has examined this regulatory language and has set forth the elements that must be present to constitute a "claim" for jurisdictional purposes. *See Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575–76 (Fed.Cir.1995) (en banc). First, because the FAR excepts from the definition of a "claim" those " 'routine request[s] for payment' that are not in dispute when submitted to the [Contracting Officer]," the request must be non-routine. *Id.* at 1575–76. Moreover, this non-routine claim for money must be: "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." *Id.* at 1575. Further, it must either explicitly or implicitly request the CO to render a final decision. 41 U.S.C. § 605(a); 48 C.F.R. § 33.206. *See also James. M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1543 (Fed.Cir.1996).

At issue in the case at bar is whether the letter plaintiff submitted to BPA on July 19, 2000 demanding "that BPA immediately offer it . . . a Block Sale Contract [for] its full 238 MW load" constitutes a claim for purposes of the CDA. *See* Motion to Dismiss,

Appendix at 14. An application of this test to the facts at bar reveals that plaintiff's July 19, 2000 letter to BPA does not satisfy the elements of a claim. As discussed above, a claim must be a non-routine request for payment. A request for payment is non-routine when it is a " 'demand for compensation for unforeseen or unintended circumstances.' " *Scan–Tech Sec., L.P. v. United States*, 46 Fed.Cl. 326, 331 (2000) (quoting *Reflectone*, 60 F.3d at 1577). A request for payment is routine if it " 'is made under the contract, not outside of it.' " *Id.* Vanalco's request was non-routine, as it constitutes a claim for breach of contract. *See Reflectone*, 60 F.3d at 1577 (citing the Supreme Court's decision in *Crown Coat Front Co. v. United States*, 386 U.S. 503, 511, 87 S.Ct. 1177, 1181, 18 L.Ed.2d 256 (1967) for the proposition that the "Supreme Court has confirmed the non-routine nature of a [request for equitable adjustment] by equating it with assertion of a breach of contract"); *Kentucky Bridge & Dam, Inc. v. United States*, 42 Fed.Cl. 501, 519 (1998). Vanalco's letter, however, plainly is not a claim for the payment of money in a sum certain. Rather, the demand was for BPA to enter a Block Sale Contract containing Vanalco's desired allocation of power.

Moreover, Vanalco's July 19, 2000 letter does not satisfy the jurisdictional requirements of a claim under the CDA for the additional reason that it was not certified in accordance with 41 U.S.C. § 605(c)(1), which mandates a claim in excess of $100,000 be certified. The following language must be included in the certification:

[T]he claim is made in good faith, that the supporting data are accurate and complete to the best of [the contractor's] knowledge and belief, and the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 605(c); 48 C.F.R. § 33.207(c). A contractor submitting its claim to the CO must "meet the requirements for certification simultaneously in one document, and not in a piecemeal fashion." *City of Burbank*, 47 Fed.Cl. 261, 271 (2000) (citing *D.L. Braugh-*

*ler Co. v. West*, 127 F.3d 1476, 1480 (Fed.Cir. 1997)); *Medina Constr. Ltd. v. United States*, 43 Fed.Cl. 537, 546 (1999). And although a contractor may cure a defective certification after filing a CDA claim in this court, a lack of any certification before filing cannot be remedied after suit is initiated. *Scan–Tech*, 46 Fed.Cl. at 335 (citing *J & E Salvage Co. v. United States*, 37 Fed.Cl. 256, 263 (1997), *aff'd*, 152 F.3d 945, 1998 WL 133265 (Fed.Cir.1998)(Table), *cert. denied*, 525 U.S. 827, 119 S.Ct. 76, 142 L.Ed.2d 59 (1998)). In this case, there is clearly no language in Vanalco's July 19, 2000 letter that even ostensibly approaches the certification language set forth in the CDA. Because the July 19th letter is entirely deficient in this respect, it is not a defect subject to cure after suit has been filed in this court.

■ If an action is to be maintained pursuant to the CDA, one of two additional requirements must be satisfied prior to instituting suit in this court. Either: (1) the contracting officer must have rendered its final decision on the claim, 41 U.S.C. § 605(b); *Alaska Pulp Corp. v. United States*, 38 Fed.Cl. 141 (1997) (citing *Sharman*, 2 F.3d at 1573; *Case, Inc. v. United States*, 88 F.3d 1004, 1008); or (2) the claim is "deemed denied" because the Contracting Officer did not respond to the claim within sixty days or notify the contractor of the time within which a decision would be issued. 41 U.S.C. § 605(c)(5); *Case, Inc.*, 88 F.3d at 1008–09 (1996) (citing *Do–Well Mach. Shop, Inc. v. U.S.*, 870 F.2d 637, 640 (Fed.Cir. 1989)). In this case, however, there can be no final decision or "deemed denial" because there has been no claim submitted. And, even assuming that Vanalco's July 19, 2000 letter constitutes a claim, Bonneville's August 3, 2000 response to that letter does not constitute a final decision because it post-dates Vanalco's complaint by one day. *See Ervin & Assocs., Inc. v. United States*, 44 Fed.Cl. at 656–57.

■ For the foregoing reasons and assuming without deciding that the CDA applies to the present case, Vanalco has not complied with the jurisdictional requirements of the CDA. Accordingly, this matter cannot fall within the exception to the general bar on this court's equitable jurisdiction carved out by the Federal Courts Administration Act of 1992.

## C. Vanalco's August 2, 2000 Complaint

■ Plaintiff's dispute falls outside the purview of this court's jurisdiction for the additional reason that the "jurisdiction of [this court] to entertain an action is dependent upon a claim for money presently due." *Com. of Kentucky ex rel. Cabinet for Human Res. v. United States*, 16 Cl.Ct. 755, 760, 1989 WL 51160 (1989). *See also* 28 U.S.C. § 1491(a)(1); *United States v. King*, 395 U.S. at 2–3, 89 S.Ct. at 1502; *Eagle–Picher Indus. v. United States*, 901 F.2d 1530, 1532 (10th Cir.1990) (stating "the test for determining if a case belongs in the [Court of Federal Claims] is whether or not the prime objective or essential purpose of the complaining party is to obtain money from the [F]ederal [G]overnment") (internal quotations omitted); *Logan*, 34 Fed.Cl. at 168 (stating "the court nevertheless lacks subject matter jurisdiction over this suit because the claim is anticipatory"); *L. Addison & Associates, Inc. v. United States*, 27 Fed.Cl. 181, 182 (1992).

■ Plaintiff has failed to demonstrate that it can overcome this jurisdictional hurdle. It is irrelevant that plaintiff may indeed be able to point to particular money damages at the time of trial, because it is axiomatic that " 'jurisdiction must be determined under the actual circumstances existing at the time a complaint is filed.' " *Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1569 (Fed.Cir.1993), overruled on other grounds by, *Reflectone Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995) (quoting *Sharman Co. v. United States*, 24 Cl.Ct. 763, 769, 1991 WL 279402 (1991)). While the complaint may be amended to cure defective allegations of jurisdiction, post-filing events cannot create jurisdiction that did not exist at the outset of the litigation. *See Newman–Green v. Alfonzo–Larrain*, 490 U.S. 826, 830, 109 S.Ct. 2218, 2222, 104 L.Ed.2d 893, *reh'g denied*, 492 U.S. 932, 110 S.Ct. 12, 106 L.Ed.2d 627 (1989); *Ervin and Associates, Inc. v. United States*, 44 Fed.Cl. 646, 656–57 (1999).

■ In its complaint, Vanalco fails to specify any sum of money that was due and owing to it at the time the complaint was filed. It only states generally and vaguely that Vanalco has suffered damages, and that its "ability to withstand continuing damages is reaching an end, and absent swift resolution of this matter Vanalco may be forced out of business." Motion to Shorten Time for Defendant to Answer Plaintiff's 12(b)(1) Motion, To Answer Complaint, and to File a Motion for Summary Judgment at 2. It defies logic that plaintiff could presently be incurring damages based on BPA's failure to enter into a contract for the sale of power that, by all counts, would not commence until after September 30, 2001. For the foregoing reasons, the claims set forth in plaintiff's August 2, 2000 complaint do not fall within this court's general jurisdictional grant of authority.

### D. Vanalco's post-Complaint attempts to establish a claim for money damages presently due

#### 1. Amendment to the Complaint

In its reply brief, plaintiff requests that if this court were to hold, as it did above, that Vanalco's claims fall outside the purview of this court's jurisdiction because they are not for money damages presently due, the court grant Vanalco permission to amend its complaint.

At oral argument, plaintiff attempted to shift this court's focus from the allegations in its complaint to a newly formulated argument in an attempt to establish a claim for money presently due. When asked by the court at oral argument whether Vanalco had present money damages, plaintiff's counsel stated:

> Your Honor, and whether you believe it or not, this is what's in our ... complaint ... We have in our contract, our 1981 power sales contract, as well as our 1987 power sales contract, [the Most Favored Nation Clause] that says we don't get to be treated worse than any other industrial purchaser. And when in 1998 Bonneville announced that it was going to base the allocations in the post–2001 period, it was entitled at that point to make the same

offer to us ... In other words, to give us an amended block sales contract. If Bonneville had done that, the divergence between what we were paying for power in the last two years, as opposed to what we would have gotten from Bonneville had we entered into this amended block sales contract, that difference would have been $35 million. That's as of, I believe last week or two weeks ago ... [I]n 1998, they amended the block sale contract, according to our theory, by saying now it contains a post–2001 right. At that point, if they had offered us that same amendment, as they were obliged to do, along with the amended block sale contract, we would have been entitled to buy power at that rod. And the difference between that rod and the rod that we bought on the market between now and then, would have been over $35 million.

Transcript of Oral Argument at 33–34, *Vanalco, Inc. v. United States*, (Fed.Cl. filed August 2, 2000).

This novel theory alleging money damages presently due was first articulated at oral argument, and is at no point set forth in plaintiff's complaint, despite plaintiff's protests to the contrary. The court reaches this conclusion after examining plaintiff's complaint in detail. The overarching thrust of plaintiff's complaint is that Vanalco seeks an amendment to the 1996 Block Sale Contract whereby it would be entitled to purchase power from BPA in the post-September 30, 2001 period. Although plaintiff does allege that BPA "owes Vanalco for any consequential damages it has suffered that were reasonably within BPA's contemplation at the time it offered to sell power to the DSIs in the post-September 30, 2001 period based on the amounts taken by each DSI that signed a Block Sales Contract," such generalized allegations are insufficient to encompass an entirely novel theory of the case. *See* Complaint ¶ 29.

For these reasons, along with those set forth in parts B and C *supra*, plaintiff has not sufficiently pled damages presently due in its complaint. Because the court finds that plaintiff's attempt to establish money

damages presently due is not present in its complaint, a determination must be made whether Vanalco may amend its complaint at this juncture.

Pursuant to Rule 15(a) of this court, a party may amend its pleading:

[O]nce as a matter of course at any time before a response is served or, if the response is one to which no further pleading is permitted and the action has not been scheduled for trial, the party may so amend it at any time within 20 days after it is served. Otherwise, a party may amend the party's own pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

RCFC 15(a).

This court has previously held that a motion to dismiss constitutes a "response" for purposes of RCFC 15(a). *See Devon Energy Corp. v. United States*, 45 Fed.Cl. 519, 526 (1999). *See also Hopi Tribe v. United States*, 20 Cl.Ct. 782, 784 n. 2, 1990 WL 103150 (1990). Although the Federal Circuit has not addressed this issue, it has stated that RCFC 15(a) "is not materially different from Fed.R.Civ.P. 15(a)." *Te–Moak Bands of Western Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1260 n. 4 (Fed. Cir.1991).

Accordingly, it is ordered that Vanalco's complaint be amended to include the above-referenced argument set forth by plaintiff's counsel at oral argument. This amendment, however, fails to cure plaintiff's Amended Complaint of its failure to state a claim for money damages presently due.

### 2. Standard of Review

As discussed *supra*, when evaluating a motion to dismiss this court must construe the allegations of the complaint favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Air Prod. and Chems., Inc. v. Reichhold Chems., Inc.*, 755 F.2d 1559, 1562 n. 4 (Fed.Cir.1985); *cert. dismissed*, 473 U.S. 929, 106 S.Ct. 22, 87 L.Ed.2d 700 (1985). Moreover, it is axiomatic that a decision concerning failure to establish subject matter jurisdiction is not a decision on the merits whereas a decision on failure to state a claim is considered as such. *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).

Generally, the question of whether the complaint states a cause of action must be decided after and not prior to the establishment of jurisdiction. *Id.* The Supreme Court has, however, delineated certain situations where it is appropriate for courts to dismiss a suit for want of jurisdiction even if the decision would involve a discussion of the merits. *Id.* These include cases "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* at 682–83, 66 S.Ct. 773. *See also Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1328 (Fed.Cir.1998), overturned on other grounds by, *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed.Cir.1999) (dismissing one of the plaintiff's counts on the grounds that it was entirely insubstantial); *Amgen v. United States Int'l Trade Comm'n*, 902 F.2d 1532, 1537 (Fed.Cir.1990); *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 276–77 (7th Cir.1988) (stating that a federal district judge can dismiss a frivolous suit on his own initiative, and "whether he calls it a dismissal for failure to state a claim or a dismissal for lack of jurisdiction is a detail"; discussing the jurisprudence of dismissing frivolous suits on the basis of subject matter jurisdiction). *Cf. Lewis v. United States*, 70 F.3d 597, 603 (Fed.Cir. 1995) (criticizing the line of cases supporting the dismissal of frivolous claims on jurisdictional grounds, but upholding the lower court's decision to this end on the basis that the court is bound by Supreme Court precedent).

### 3. Vanalco's argument

Generally, as discussed *supra*, when evaluating a motion to dismiss this court construes plaintiff's allegations as true. In the instant case, however, the argument set forth by Vanalco's counsel at oral argument, and now a part of the complaint, is so patently without

merit so as to justify a dismissal. The analytical defects in Vanalco's argument are profound, and the argument was apparently concocted in an attempt to bring the claims set forth in Vanalco's original complaint within the purview of this court's jurisdiction. In fact, the argument is so cryptic it is difficult to articulate in a readily comprehensible manner.

As detailed above, the premises and conclusion of this argument are as follows:

(1) In 1998, BPA announced its intention to base power allocations for the post-September 30, 2001 period on power purchases in the 1996–2001 period;

(2) Pursuant to contractual obligation, BPA was required to offer Vanalco an Amended Block Sale contract at the time it announced this intention;

(3) If, in 1998, BPA had offered Vanalco an Amended Block Sale contract it would have accepted the offer; and

(4) From 1998 to the present, Vanalco has been purchasing power that has cost it $35 million more than the power that it should have had the opportunity to purchase under the Amended Block Sale contract.

(5) Therefore, Vanalco is entitled to $35 million in damages.

An examination of this argument and Vanalco's own statement of the facts reveals that this argument is frivolous, as no valid claim for money damages could conceivably exist under the facts present in this case. In 1996, when Vanalco and the other DSIs were negotiating the settlement of their disputes with BPA, Vanalco could have made one of three decisions. It could have:

(1) entered a 1996 Block Sale Contract, (the option most of the DSIs elected) Complaint at ¶ 9;

(5) "[gone] to market for approximately 220 MW of its 230 MW load [and] not otherwise amend the terms of the 1981 [contract] . . ." *Id.;* or

(6) ceased all purchase of industrial firm rate power from BPA.

Vanalco elected option number 2. The crux of Vanalco's argument for present money damages is: (1) the BPA's decision regarding allocation of power in the post-September 30, 2001 period is an amendment to the 1996 Block Sale Contracts; and (2) because BPA amended the terms of the 1996 Block Sale Contracts, it was contractually obligated to offer Vanalco an entirely new contract.

BPA's allocation decision is not even ostensibly an amendment to the 1996 Block Sale Contracts.[3] Vanalco effectively concedes, in its own argument, that BPA's allocation decision is not an amendment to the 1996 Block Sale Contract. The fact that Bonneville opted to base future allocation on purchases in the 1996–2001 period shows that it did not specifically rely upon the 1996 Block Sale Contracts in making its future allocation decision. If BPA had relied upon the 1996 Block Sale Contracts to determine power sales allocation, then Vanalco would not be entitled to receive *any* power in the post-September 30, 2001 period, since Vanalco declined to enter into a 1996 Block Sale Contract. However, by Vanalco's own admission, under BPA's current allocation plan, Vanalco will have the right to purchase a proportionate amount of power in the post-September 30, 2001 period. *See* Complaint ¶ 15 (stating that "[s]ince Vanalco did not agree to a Block Sale Contract, Vanalco would not receive *as much* power in the post-September 30, 2001 period as it would have had it agreed to sign a Block Sale Contract in 1996" (emphasis added)). It follows that BPA's allocation decision is entirely distinct from the 1996 Block Sale Contracts, and is in no way an amendment to those contracts.

Even assuming that BPA's allocation decision could be construed as an amendment to the 1996 Block Sale Contracts, there is no conceivable basis upon which BPA would be required to offer Vanalco an *entirely new* Block Sale Contract—the very same contract

---

**3.** The court notes that at oral argument the Government pointed out the fact that technically speaking, BPA's decision is not absolutely final until it receives the final record of decision back from review by the Federal Regulatory Commis-

sion and BPA determines whether to take any further action on the decision. For purposes of this opinion, however, the court will treat BPA's decision as final.

Vanalco declined to enter in 1996. In this case, Vanalco does not seek an amendment to the 1996 Block Sale Contract, it seeks an entirely new contract. *See* Complaint at ¶ 1 (stating "[t]he amended Block Sale Contract was not offered to Vanalco in violation of the express and implied covenants of Vanalco's 1981 [contract]"); Transcript at 34 (stating at the point "[BPA] amended the block sale contract ... if they had offered us that same amendment, as they were obliged to do, *along with the amended block sale contract* we would have been entitled to buy power at that rod" (emphasis added)). Vanalco's claim is a transparent attempt to extricate itself from an unfortunate business decision. Through its assertion that Bonneville was required to retroactively award it a Block Sale Contract and retroactively pay it the difference between the power it has been purchasing and the power it could have purchased under the 1996 Block Sale Contract, Vanalco seeks a renewed offer of a contract that it declined to accept in 1996. BPA did not, however, as Vanalco alleges, deprive it of the benefit of the bargain—Vanalco deprived itself of the benefit of the bargain. Plaintiff's argument is, on its face, totally baseless and without merit.

The circumstances under which Vanalco raises this argument, coupled with the fact that the argument contradicts aspects of plaintiff's August 2, 2000 complaint, support a conclusion that this argument was apparently concocted in an attempt to bring the claims set forth in Vanalco's original complaint within the purview of this court's jurisdiction. Vanalco never mentioned any claim for $35 million in damages in its complaint. It was only after the Government filed its motion to dismiss and Vanalco apparently realized that the claims set forth in its August 2, 2000 Complaint did not fall within this court's jurisdiction, that it set forth its argument alleging money damages.

Another relevant circumstance is the timing of Vanalco's suit. Significantly, Vanalco learned on or around July 18, 1999 that BPA would "utilize[ ] the 1996 Block Sale

Contracts with the DSIs as the basis for allocating power in the period" in the post-September 30, 2001 period. Complaint at ¶ 14. Despite this fact, it waited until more than a year later, August 2, 2000, to initiate the present action. This fact illustrates that Vanalco had more than ample time to formulate its theory of the case and include without ambiguity in its complaint any meritorious arguments that may have assisted it in (1) establishing subject matter jurisdiction; and (2) ultimately prevailing on the merits. In view of these circumstances, the theory set forth at oral argument, now a part of the complaint, was clearly devised in order to bring Vanalco's claims under this court's jurisdiction.

As the Supreme Court has stated, "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous" a court may dismiss an action for want of jurisdiction even if the decision would involve a discussion of the merits. *Bell v. Hood*, 327 U.S. at 682–83, 66 S.Ct. 773. Because the theory of money damages set forth at oral argument and amended into the complaint is totally without merit and apparently made solely for the purpose of obtaining jurisdiction, it is dismissed for failure to state a valid claim for money damages.

For the foregoing reasons, the Government's motion to dismiss is granted and Vanalco's complaint is dismissed.[4]

## CONCLUSION

For the above-stated reasons, it is **ORDERED** that:

(1) Vanalco's complaint is **AMENDED** to include the above-referenced argument set forth by plaintiff's counsel at oral argument, the premises and conclusion of which are as follows:

    (a) In 1998, BPA announced its intention to base power allocations for the post September 30, 2001 period on

---

4.  Because this court clearly lacks jurisdiction to hear Vanalco's claims, it is unnecessary to consider the issues of (1) whether the 9th circuit has

exclusive jurisdiction over this dispute; and (2) whether the CDA applies to the sale of electric power.

power purchases in the 1996–2001 period;

(b) Pursuant to contractual obligation, BPA was required to offer Vanalco an Amended Block Sale contract at the time it announced this intention;

(c) If, in 1998, BPA had offered Vanalco an Amended Block Sale contract it would have accepted the offer; and

(d) From 1998 to the present, Vanalco has been purchasing power that has cost it $35 million more than the power that it should have had the opportunity to purchase under the Amended Block Sale contract.

(e) Therefore, Vanalco is entitled to $35 million in damages.

(2) The Government's Motion to Dismiss Plaintiff's Complaint is hereby **GRANTED** based on this court's lack of jurisdiction to entertain the claims set forth in Plaintiff's Complaint and Amended Complaint.